UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

A.B., BY AND THROUGH HIS
PARENTS AND NEXT FRIENDS,
K.B. and R.B., and K.B. and R.B.,
Individually,

        Plaintiffs,

v.

MICHIGAN DEPARTMENT OF EDUCATION,

        Defendant.
_____/

File No. _____

Hon. _____

MICHIGAN PROTECTION AND
ADVOCACY SERVICE, INC.
Erin H. Diaz (P80388)
Mitchell D. Sickon (P82407)
Attorneys for Plaintiffs
4095 Legacy Parkway, Suite 500
Lansing, MI 48911
(517) 487-1755
ediaz@mpas.org
msickon@mpas.org

_____/

# **COMPLAINT**

    **NOW COME THE PLAINTIFFS,** A.B., through his parents and next friends, K.B. and R.B, filing this Complaint against the Michigan Department of Education.

## I.     INTRODUCTION

1.     This case involves special education interventions and resources that are necessary—on a state level—to educate a child from a rural Michigan village in the Upper Peninsula who needs intensive supports for challenging behaviors. Despite two state administrative complaints to the state, requests to the State Attorney General's Office, and a due process action against the State, the Michigan Department of Education refused to supervise, monitor, and intervene.  As a result, A.B. has lost over *three years* of education.  Accordingly, this federal lawsuit is necessary.

## II.     PARTIES, JURISDICTION AND VENUE

2.     Plaintiff, A.B., is a minor child, born July 30, 2009, who resides with his parents, K.B. and R.B. (with A.B., collectively, "Plaintiffs").  They reside within the Ontonagon Area School District ("the District"), County of Ontonagon, in the State of Michigan.

3.     A.B. is covered by the IDEA, 20 U.S.C. §§ 1400 *et seq.*, the ADA, 42 U.S.C. §§ 12131 *et seq*., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, Michigan Mandatory Special Education Act, Mich. Comp. Laws 380.1701 *et seq.*, and its regulations (Michigan Administrative Rules of Special Education, Mich. Admin. Code. R. 340.1701 *et seq.*). He has an Individualized Education Program (IEP) providing him "special education," due to disabilities that include Adjustment

Disorder with Mixed Disturbance of Emotions and Conduct, Unspecified Neurodevelopmental Disorder, Attention-Deficit Hyperactivity Disorder, Combined Type ("ADHD"), Oppositional Defiant Disorder ("ODD"), Unspecified Mood Disorder, and Anxiety Disorder Unspecified.  These disabilities entitle A.B. to services under the IDEA's category of Emotional Impairment, 34 C.F.R. §300.8; MARSE R 340.1706. They are also medical impairments that substantially limit A.B. in the major life activities of social interaction, interpersonal skills, mood regulation, socially acceptable behavior, handling transitions, communication, perception and, of course, learning.

4.     K.B. and R.B., the parents, are associated with (by direct familial association) with a person with a disability, A.B., their son, under Section 504 and the ADA. *See* 42 U.S.C. §12182.

5.     The Michigan Department of Education ("MDE") is a State Educational Agency ("SEA") under 20 U.S.C. § 1401(32) ("The term [SEA] means the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools . . . ."). MDE receives IDEA funding by submitting plans to the Secretary of the U.S. Department of Education that "provide[] assurances . . . that the State has in effect policies and procedures to ensure that . . . [a] free appropriate public education is available to all children with disabilities residing in the State." 20 U.S.C. § 1412.  MDE also

receives federal assistance and qualifies as a program under 29 U.S.C. § 794.  As the state educational agency, MDE is a public entity subject to Title II of the ADA. 42 U.S.C. § 12131.

6.      Jurisdiction is conferred upon this Court by Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

7.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, based upon the federal question raised herein, and 28 U.S.C. § 1343, because this action is brought to vindicate Plaintiffs' civil rights under the IDEA. Additionally, this Court has jurisdiction pursuant to the Americans with Disabilities Act, with Amendments, 42 U.S.C. §12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. §794.

8.      This Court has supplemental jurisdiction over the state claims under the Michigan Mandatory Special Education Act, Mich. Comp. Laws 380.1701 *et seq.*, and Michigan Administrative Rules for Special Education, Mich. Admin. Code. R. 340.1701 *et seq.*, pursuant to 28 U.S.C. § 1367(a).

9.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiffs reside within the Western District of Michigan and all events and

omissions giving rise to this Complaint occurred in this district. Additionally, Defendant is located and/or operates within the Western District of Michigan.

10.    To the extent that administrative exhaustion is required against the MDE, Plaintiffs have done so by filing a due process action against MDE on February 21, 2019.  MDE resisted any administrative exhaustion by filing a motion for summary disposition on June 21, 2019.  The administrative law judge granted that motion on July 26, 2019, thus completing exhaustion. The entire matter was dismissed by the administrative law judge through an order on October 1, 2019. Any further exhaustion would be futile or inadequate.

### III.   FACTS

11.    A.B. is an engaging, creative, and caring ten-year-old boy who likes Legos, art, music, dancing, and math. He loves telling jokes and stories, making people laugh. He also likes baseball and board games.

12.    Pertinent to *this* Complaint, A.B. would love to make friends.  But that requires a combination of thoughtful adult intervention for the unique and challenging nature of his disabilities, *plus the resources* to assist him.

13.    In November 2015, A.B. enrolled in his local school district, in the rural village of Ontonagon, Michigan, along the south shore of Lake Superior in the Upper Peninsula. The Ontonagon Area School District (the District) serves fewer than 300

students.[1]  The District placed A.B. on a shortened, four-hour school day beginning his second day of enrollment. By December, the District had shortened A.B.'s school day to one hour, 3-5 days a week.

## A.    A.B.'s First State-Level Complaint to MDE

14.    After experiencing a year of shortened day, A.B. filed an administrative Complaint against the District with the Defendant, Michigan Department of Education (MDE), pursuant to 34 C.F.R. 300. 151-53 and MARSE R 340.1851. (MDE Complaint #1).  He complained of a shortened day schedule, lack of positive behavior supports, and deprivation of a FAPE.

15.    On December 22, 2016, MDE found A.B.'s District out of compliance, and that A.B. had been denied a FAPE.  In fact, MDE found the District out of compliance on all issues it investigated.  MDE determined that (a) the IEP team had reviewed and revised the IEP four times, but reduced the student's school day, impacting his ability to access a FAPE; (b) the District had failed to consider a continuum of alternative placements before reducing the school day; and (c) the District added a clause in A.B.'s behavior intervention plan that would incorrectly document classroom removals under the IDEA.

---

[1]  The District is A.B.'s home district and as such, is the local education agency ("LEA") responsible for providing him with a FAPE and the procedural protections required under the IDEA.
https://www.mischooldata.org/SpecialEducationEarlyOn2/DataPortraits/DataPortraitsDisability.aspx

16.     As a remedy, MDE required the District to provide, among other remedies, 30 hours of specialized academic instruction, and 15 hours of behavioral instruction.  It also required the District to seek consent for a Functional Behavior Assessment by a qualified behavioral specialist, to be followed by a Behavioral Intervention Plan.  It required the District to develop, review, and revise A.B.'s IEP with consideration of the full continuum of services and to correct previous non-compliance.

17.     MDE also ordered the District to work with the Intermediate School District to develop, review, or revise the District's written procedures related to (a) providing a FAPE; (b) revising a student's IEP, considering the least restrictive environment; (c) disciplinary removals from instruction, and (d) implementing special education and related services. MDE required these procedures to be developed no later than April 1, 2017, with related professional development no later than August 15, 2017.

18.     MDE recognized that the District must have appropriately trained personnel, citing 34 CFR § 300.156(a).  However, that obligation actually requires *MDE*, as the State Education Agency, "to establish and maintain qualifications to ensure that personnel necessary to carry out the purposes of this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities."

7

19.    Despite MDE's findings, the District retained A.B. on a reduced instructional day for the entire year of 2016-2017 and, then again, in 2017-2018.

20.    MDE did not ensure the District complied with its instruction. Rather, on November 28, 2017, MDE closed the matter with a MDE-OSE, noting its "Closeout of Findings" as follows:

> August 22, 2017 - 2 New Special Educators attended New Teacher Training at the GOISD - IEPs covered and LRE Continuum shared and district using at meetings. New Special Educators are including GOISD school social worker and behavioral consultant in behavior meeting and using the LRE Continuum guide in providing FAPE in reviewing progress and adjusting inst. and programming when necessary.

## B.    A.B.'s Second State-Level Complaint to MDE

21.    On January 10, 2018, the District held an IEP meeting and took the position that "[b]ased on the severity of [A.B.'s] behaviors, the IEP team placed [A.B] on a 45-day alternative placement. He will be seen at the courthouse by all service providers to continue working on all of his goals until his return on February 28."

22.    The District maintained that A.B.'s "current behaviors do not permit him to be at school for a longer period of time or participate in the general education

classroom. The current placement and time are deemed most appropriate."[2]   His educational time was reduced from six hours per week to four hours per week.

23.    On April 4, 2018, A.B. filed a second administrative complaint with the Michigan Department of Education (MDE), pursuant to 34 C.F.R. 300. 151-53 and MARSE R 340.1851. (MDE Complaint #2).   However, this Complaint targeted *the MDE*, not the District.

24.    Complaint #2 stated that MDE *itself* had violated the IDEA because it failed to supervise and monitor the District, failed to correct the District's noncompliance, and allowed a continuing practice of denying A.B. full-day access to school and a FAPE.  The Complaint explained how the "compensatory education" that the District was supposed to have provided (for the shortened school days) were being undertaken *during the shortened school days,* instead of in addition to the school day.

25.    MDE had "closed its file" even though A.B.'s FAPE deprivations, along with the District's failure to conduct appropriate and necessary evaluations, including a functional behavior assessment, were ongoing.

---

[2] Actually, the IEP itself showed that A.B. was compliant 47% of the time, an increase from the previous year's 20% compliance rate. His behavior goal, however, required no physical aggression and compliance with adult requests at 95% frequency.

26.     On June 1, 2018, MDE found *itself* in violation with respect to MDE Complaint #2.   However, MDE's finding of non-compliance did not help A.B. Instead, MDE blamed *the District* for not submitting paperwork timely.   Thus, the corrective action merely required MDE to ensure timely submission of documents by districts.

27.     MDE failed to address the root problem:   its own failure to supervise and monitor a district it had found in non-compliance, resulting in a continuing exclusion from the general education population and failure to provide a free appropriate public education for A.B.   Nor did MDE provide technical assistance to the small District of Ontonagon.

28.     On August 1, 2018, MDE issued another of its "closing" documents, stating that MDE Complaint #2 had been resolved when, in fact, it had not.   On September 4, 2018, despite two MDE Complaints, the District reduced A.B.'s school hours to between two and three hours per day (12:30-3:11 or 1:00-3:11, depending on the day of the week).

## C.    A.B.'s Third Formal Notice to MDE

29.     After two failed state level administrative complaints, A.B. put the State on notice a third time.   A.B. sought assistance through the Michigan Attorney General's office.

30.    On September 26, 2018, through the Attorney General's Office, MDE pledged that it would visit the District, review student documents, observe the student, review continuum of services in the ISD, meet with staff, and create an action plan, if needed.  It assigned a State Complaint Coordinator, Marcia O'Brien, for an on-site visit and other interviews.

31.    Ms. O'Brien addressed a "reintegration plan" with the District, addressing *how* to reintegrate A.B. in school.  She outlined a plan and reminded the District that it must increase A.B.'s school day incrementally, regardless of his behaviors, while frontloading behavior supports. The plan also identified the District might "need support from the MDE-OSE Program Finance department to problem solve financial challenges in supporting all options."

32.    On October 29, 2018, Ms. O'Brien provided the family a draft "action plan" with concrete recommendations for the District to support A.B.  This included noting, specifically, that A.B. had demonstrated the ability to learn in the general education classroom with supports and that a partial day was not his least restrictive environment.

33.    On November 5, 2018, Ms. O'Brien also warned the District not to reintegrate A.B. without providing additional supports to him.  She gave suggestions of what such supports might look like.

34.     A.B. retained an expert consultant, Dr. Lloyd Peterson.  On November 28, 2018, Dr. Peterson observed and evaluated A.B.'s behaviors while at the District. The report was provided to the District on December 14, 2018. Like Ms. O'Brien, Dr. Peterson concluded that A.B. could be educated in his current school with appropriate supports (e.g., structured social skills training, scripted Direct Instruction lessons, and training for staff).

35.     A.B.'s behavioral challenges continued, and at times spiked.   On November 30, 2018, a behavior incident ended in A.B.'s refusal to exit a school bus, resulting in police involvement and a "threat assessment."   A "manifestation determination" was held on December 11, 2018, wherein the District found that A.B.'s behavior was indeed a manifestation of his disability.

36.     Although A.B.'s behavior was a manifestation of his disability, the District advised A.B.'s parents, that same day of December 11, 2018, that A.B. could not come back to school.  Instead, he would have to be educated at the local police station.  Predictably, that environment did not calm A.B.'s behaviors and, in January of 2019, the local police station was rejected as a placement.

37.     On January 28, 2019, the District began another IEP meeting. This time, the District proposed placing A.B. at "Teaching Family Homes," a facility, which is a child caring institution that typically serves children who are wards of the State, due to delinquency or abuse/neglect. The facility is two hours removed from A.B.'s

home in Ontonagon, contrary to the recommendation of A.B.'s psychiatrist, and does not employ board certified behavior analysts.

38.     The IEP meeting continued on February 7, 2019, with A.B.'s advocate suggesting that Teaching Family Homes was too restrictive, considering lesser supports had not been tried.  The District's superintendent explained that, being a small and very rural District, it did not have the resources, staff, or levels of expertise available to help A.B., and that he had been unable to hire staff such as a special education teacher with training.

39.     The superintendent emphasized that for A.B. to have a full educational day, it could not occur in the District and it would be necessary to place him two hours away at Teaching Family Homes. Following the superintendent's lead about lack of resources, the District offered Teaching Family Homes as the placement due to (a) Lack of available staff; and (b) Lack of structured setting for safety.

40.     A.B.'s family did not agree with this reasoning, or this placement.

### D.     A.B.'s Fourth Formal Notice to MDE

41.     On February 21, 2019, A.B. filed a due process complaint naming not only the District and Intermediate School District, but also MDE. By this point, A.B. had been denied FAPE for over three years and the District had not received help from MDE.

42.     In the spring of 2019, the District began to consider developing a regional program for students with emotional impairments. This would serve A.B. and others. However, according to the District, MDE refused to support this program, and it was abandoned.

43.     MDE sought and obtained a dismissal on grounds that jurisdiction was lacking.  As a result, A.B. was *again unhelped by MDE.*

44.     After the dismissal, MDE took no further steps to intervene or assist A.B. Instead, it watched a rural village—Ontonagon Area School District—defend against a child with special needs, A.B., who desperately needed an appropriate education, placement, and supports. This illustrates how MDE has a "hands off" approach to remedies—despite two state complaints in which noncompliance was established, recommendations by its own investigator, and a due process notice, MDE provided A.B. with no relief at all.

### E.     MDE Did Not Assist the District Either

45.     On August 16, 2019, A.B. reached a settlement with the District, closely evaluating the District's systemic concerns.  Not only had A.B. been seeking help from MDE, but so, too, had the District.  The District noted, as part of the settlement agreement that it "sought assistance from Michigan Department of Education on how to provide a free appropriate public education" to A.B.

46.     According to the District, again in writing, the Michigan Department of Education "*knowingly* failed to provide consistent or meaningful assistance." (emphasis added).

47.     The District explained, again in writing, that it has "concerns about the state-wide funding disparities and deficits related to special education programming."  The small school district of Ontonagon did not have "adequate funding to provide appropriate services to students with intensive behavioral needs" like A.B. Settlement Agreement September 27, 2019.

48.     Accordingly, A.B. carved out liability for MDE as part of the settlement, particularly since these are systemic issues relating to funding and infrastructure for intensive behavioral needs, and A.B. has *not* been compensated for the loss of a free appropriate public education for the past three years, he has not received a complete remedy, and the District lacks the funding, training, and resources to do so.

49.     On October 1, 2019, the ALJ approved and adopted the terms of the settlement.

50.     In summary, from Fall 2016 through Spring 2019, A.B. filed two substantiated state complaints with MDE, brought concerns to MDE, resulting in a return visit from an MDE investigator, heard from the District that it lacked the resources to assist A.B., and filed a due process complaint against MDE.  None of it

motivated MDE to provide relief, training, enforcement, or supervision. Thus, there is overwhelming notice to MDE that it has failed in its monitoring and supervision and direct-action responsibilities to A.B.  Its actions are knowing and/or deliberately indifferent to A.B.'s educational rights.

51.    As a result, A.B. has lost so much educational time that compensatory education can only partially remedy his deprivation, if at all; instead, damages for the MDE's deliberate indifference to his educational deprivation are necessary.

52.    A.B. has suffered humiliation and embarrassment due to disabilities over which he lacks control. The adults have failed to provide him the necessary supports and structure and education, affecting his self-esteem and well-being. Similarly, A.B.'s parents have been bystanders—family associations—watching their son struggle mightily, suffering pain and humiliation themselves.

## IV.   LEGAL CLAIMS

53.    The foregoing paragraphs are incorporated.

### A.

### Count I.  – IDEA

54.    Under the IDEA, MDE repeatedly failed in its monitoring and supervising obligations.  20 U.S.C. § 1412(a), 1416; 34 C.F.R. §§ 300.120, 149(a), 600-602, 606-608.

55.     It failed to ensure the District had qualified personnel able to provide FAPE in the LRE to A.B. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.156.

56.     It failed to provide adequate funding to the District to provide FAPE in the LRE to A.B. 34 C.F.R.  § 300.114(b).

57.     It failed to provide technical assistance that would allow the District to provide FAPE in the LRE to A.B. 34 C.F.R.  § 300.119.

58.     It failed to provide adequate training to the District about FAPE in the LRE.  *Id.*

59.     It failed to enforce the IDEA when put on notice of A.B.'s denial of FAPE in the LRE. 20 U.S.C. § 1413(g); 34 C.F.R. § 300.151.

60.     It failed to assist in implementing corrective action when it found that A.B. was being denied FAPE in the LRE. 34 C.F.R. § 300.151.

61.     It failed to provide FAPE directly to A.B. when the District was unable or unwilling to do so. 20 U.S.C. § 1413(g)(1)-(2).

62.     MDE failed in its ultimate responsibility to ensure that A.B. received a FAPE in his LRE with appropriate supports and services, choosing instead to blame a rural school District that lacked the infrastructure and support necessary to do so. 20 U.S.C. § 1412(a)(11)(A).

**B.**

## Count II.  – Section 504 and the ADA

63.     Under Section 504 and the ADA, MDE failed to intervene on behalf of a district denying a child an adequate education commensurate with his non-disabled peers.  As a result of the MDE's failure to supervise the District, failure to ensure trained staff, and failure to provide appropriate funding to the District, the District engaged in discrimination against A.B. A.B. was excluded and segregated in violation of Section 504 and the integration mandate of the ADA. *See* 29 U.S.C. § 794;  42 U.S.C. §§ 12101, 12132; 45 C.F.R. § 84.3-84.4; 28 C.F.R. § 35; 34 C.F.R. § 104.4(b)(1)(v).

64.     Defendant has intentionally discriminated against A.B. and his parents in violation of Section 504 by failing to provide a FAPE in the least restrictive environment. 34 C.F.R § 104.33-34.

65.     As a direct and proximate cause of Defendant's violation of Section 504, A.B. and his parents have suffered and continue to suffer mental and emotional suffering, humiliation, stigma, and other injuries. 29 U.S.C. § 794.

66.     Defendant intentionally violated A.B.'s rights under the ADA and the regulations promulgated hereunder by denying him access to equal educational opportunities afforded to students without disabilities, by excluding him from

participation in and denying him the benefits of Defendant's services, programs, and activities, and by subjecting him to discrimination. 42 U.S.C. § 12132.

67.     As a direct and proximate cause of MDE's violation of the ADA, A. B. and his parents have suffered and continue to suffer mental and emotional suffering, humiliation, stigma, and other injuries. 42 U.S.C. § 12132, 12182.

## C.

## Count III – MMSEA and MARSE

68.     Under Michigan Administrative Rules for Special Education ("MARSE"), Mich. Admin. Code R. 340.1700 *et seq.*, Defendant failed to maintain an effective complaint resolution process, resulting in the continued denial of FAPE for A.B.

69.     When the District continued to deny A.B. a FAPE and restricted A.B.'s individualized education program to the programs and services available, in violation of MARSE, Defendant failed to bring the District into compliance or utilize its sanction power, violating MARSE.

## V. REQUESTED RELIEF

Plaintiffs respectfully request that this Court:

1.     Issue a declaratory Judgment on behalf of Plaintiffs declaring the actions, policies, and practices as alleged herein violate the IDEA; Section 504; Title II of ADA; and MARSE.

19

2.      Issue a permanent injunction directing MDE to implement appropriate policies, procedures and protocols to remedy the failures alleged herein with respect to A.B;

3.      Issue a final Order and Judgement awarding:

   a.      Equitable relief and compensatory education or compensatory education fund given the length of deprivation;

   b.      Reimbursement for all out of pocket expenses and services;

   c.      Compensatory related services and transition services as needed;

   d.      Compensatory Damages to A.B. in a supplemental needs trust for:

      i.      Exclusion due to segregation, loss of friendship and society of typical peers and isolation in the amount of $1,000 per school day for the entire period of the educational loss until such time as the exclusion is cured.

      ii.     Loss of general education time/exclusion from activities and curricula due to A.B.'s disability in the amount of $1,000.00 per school day for the entire period of the educational loss; and

      iii.    A sum to represent emotional distress damages and pain and suffering.

e.   Ordering compensatory relief to the parents for their emotional distress damages and pain and suffering;

f.   Ordering an extension of A.B.'s eligibility for general and special education instruction for at least three years beyond applicable statutes; and

g.   Appoint an independent monitor or ombudsperson to oversee and administer the compensatory education award.

4.   Implement a state-wide, pro-active enforcement protocol for ensuring compliance with corrective action plans that includes, but is not limited to, a determination of whether the corrective action plan has resulted in providing an educational program more "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *Endrew F.*, 137 S.Ct. 988, 999 (2017);

5.   Hire and/or allocate the appropriate number of staff to ensure that corrective action plans are enforced and result in the correction of identified noncompliance;

6.   Engage in pro-active monitoring, including substantive review of the facts and follow-up with parents to review the child's current circumstances, to ensure continued compliance with federal and state law;

7.      Order MDE to exercise its authority under MARSE R. 340.1855;

8.      Provide funding to the local school district, as needed, to comply with

this order;

9.      Award Plaintiffs their costs and reasonable attorneys' fees; and

10.     Order any other and further relief, both legal and equitable, that this

Court may deem just and proper.


Dated:  December 19, 2019                    _____*/s/ Erin H. Diaz*_____
                                             Erin H. Diaz (P80388)
                                             Mitchell D. Sickon (P82407)
                                             Michigan Protection and Advocacy
                                             Service, Inc.
                                             Attorneys for Plaintiffs
                                             4095 Legacy Parkway, Suite 500
                                             Lansing, MI 48911
                                             Phone: (517) 487-1755
                                             ediaz@mpas.org
                                             msickon@mpas.org